SAMUEL J. COWPERTHWAIT, APPELLEE, V. ISRAEL W. BROWN, APPELLANT.

FILED SEPTEMBER 16, 1908.   No. 15,271.

1. **New Trial: INSTRUCTIONS: ASSIGNMENT OF ERRORS.** "An assignment in a motion for a new trial that a group of instructions is erroneous is bad if any one of them was properly given." *City of South Omaha v. Powell,* 50 Neb. 798.

2. **Appeal: VERDICT: ASSIGNMENT OF ERRORS.** An assignment of error that "the verdict is contrary to law" raises the question whether the verdict is contrary to the law as contained in the charge given by the court to the jury, but nothing more. *Drexel v. Daniels,* 49 Neb. 99.

3. **Assault and Battery: JUSTIFICATION.** A father who owns land upon which is situated a dwelling house, which, with his permission, is occupied by a married son and his family as a residence, is without right to enter upon the premises so occupied by the son for the purpose of ejecting a third person, objectionable to the father, who is there on the invitation of the son.

4. ——: ——. The fact that the son is in poor health, and that the father is contributing to his support, is immaterial.

5. ——: **LIABILITY.** If the father in attempting to eject such third person commits an assault upon him, he is liable in an action for the damages resulting therefrom.

APPEAL from the district court for Pawnee county: WILLIAM H. KELLIGAR, JUDGE. *Affirmed.*

*Francis Martin* and *J. C. Dort,* for appellant.

*Story & Story,* contra.

FAWCETT, C.

This action was brought in the district court for Pawnee county to recover damages for an assault. The petition is in the usual form. The answer is a general denial, coupled with an allegation that "the plaintiff unlawfully and against the will and wishes, and against the protest of this defendant, entered upon the premises of this de-

fendant, and was in the act of trespassing thereon, and this defendant, finding the plaintiff in the act of trespassing upon defendant's premises, ordered plaintiff to depart therefrom, but the plaintiff, being of a pugnacious and quarrelsome disposition, which was well known to this defendant, refused to depart, and assumed a defiant and hostile attitude toward this defendant, and made a demonstration with his clenched fists as if about to assault this defendant, and thereupon this defendant, in self-defense, and to enforce his authority over his own premises, and for no other reason, removed said plaintiff from the premises of defendant, where the plaintiff was then trespassing, and in the removal of said plaintiff from said premises this defendant used no more force than was actually and reasonably necessary." The reply is a general denial. There was a trial to the court and a jury, which resulted in a verdict in favor of the plaintiff for $150. From the judgment thereon this appeal is prosecuted.

Defendant assigns 38 errors. The first 22 refer entirely to the sustaining and overruling of objections to the admission of evidence. We have read the record, and have been unable to find any prejudicial error in any of the rulings complained of in these 22 assignments.

Assignments 23 to 26, inclusive, relate to instructions given by the court on its own motion, and 27 to 31, inclusive, to instructions asked for by plaintiff, and given. The four instructions given by the trial court on its own motion are excepted to in the motion for new trial in one paragraph as follows: "(9) The court erred in giving the first, second, third and fourth paragraphs of the instructions given by the court on its own motion." The five instructions asked by plaintiff, and given, are excepted to in the motion for new trial in one paragraph as follows: "(7) The court erred in giving the first, second, third, fourth and fifth paragraphs of the instructions asked for by the plaintiff." These assignments in the motion for new trial were not sufficient to lay the foundation for a

consideration of the instructions here further than to ascertain whether any one of the instructions in either group correctly stated the law. *City of South Omaha v. Powell,* 50 Neb. 798, is exactly in point, and states the well-settled rule in this state. In that opinion, speaking through Mr. Justice NORVAL, we said: "Similar assignments in motions for new trial have been held insufficient repeatedly, and that they would be considered by the appellate court to the extent alone of ascertaining if any one of the instructions was correct in each group given." We have examined the instructions in each of the groups in the case before us sufficiently to know that they were not all erroneous in either group, and, hence, these assignments must be held to be unavailing.

The 34th assignment is: "The verdict is contrary to law." Such assignment raises the question whether the verdict is contrary to the law as contained in the charge given by the court to the jury, but nothing more. *Drexel v. Daniels,* 49 Neb. 99. In the present case we think the verdict is clearly within the law as contained in the charge given by the court. Assignments 32, 36 and 37 are formal only. This leaves the only questions for consideration on this appeal the thirty-third, thirty-fifth and thirty-eighth assignments, that "the verdict is not sustained by the evidence," that "the damages awarded are excessive," and "the verdict was the result of bias and prejudice."

The evidence discloses the following facts: Plaintiff is engaged in the livery business in Pawnee City, while defendant is living on a farm some six or seven miles in the country. Prior to engaging in the livery business in Pawnee City, plaintiff was also engaged in farming, and was a near neighbor to defendant. Some 10 or 12 years prior to the date of the assault, defendant's son married plaintiff's stepdaughter, Nancy. Plaintiff and his wife, Nancy's mother, have been living together as husband and wife for 27 years. Prior to her marriage, Nancy lived with plaintiff and her mother as their child. About 10

years prior to the assault, defendant sold his son Charles some land near defendant's home, upon which Charles built a dwelling by reconstructing and adding an addition to an old building which stood upon the land, and also built a new barn; at least $300 of Nancy's money going into the construction of those buildings. The land was sold to Charles under a written contract. Charles seems to have been an industrious and successful farmer, doing business with his father and a brother; the bank account being in the name of the three, against which each checked without restraint. Some years prior to the time of the assault, Charles became afflicted with rheumatism. He seems to have suffered greatly from this affliction. His father was faithful to him, and manifested a father's affection by sending him to Sycamore Springs on two different occasions for treatment. This treatment producing no favorable results, it was decided to send him to the Hot Springs for prolonged treatment. Prior to going to the Hot Springs, Charles stated to his father that he would be unable to keep up the payments on the land, would be unable to carry through the deal, and delivered up his contract to his father and turned over the possession of the land. He then went to Hot Springs and remained there for two years. During all of the time he was at the Hot Springs, his wife, Nancy, worked in a restaurant and took in sewing to help support herself and husband; the defendant supplying whatever additional funds were necessary for that purpose. When Charles and his wife went to Hot Springs, they left all of their furniture in the house on the farm, left one key with the defendant and another with the plaintiff. Defendant and his wife stored the furniture, carpets and other household effects in one room of the house. The house remained in that condition until the return of Charles and his wife from the Hot Springs a few days prior to the assault. When it was decided that Charles was to return defendant's wife went to the house formerly occupied by Charles and Nancy, cleaned the house

thoroughly, relaid the carpets, put the furniture all in order; in fact, thoroughly prepared the house for the return of their son and his wife. On the day when Charles and his wife returned to Pawnee City, defendant was in town, expecting to meet them and take them out to their home. He found that Charles and his wife were stopping at the home of plaintiff. Charles informed his father that they were not ready to go out that day; that his wife wanted to have some dental work done first. Some two or three days later defendant again went to Pawnee City for the purpose, as he states, of taking his son home. Not finding Charles in town, he telephoned plaintiff's residence, and was informed by a daughter of plaintiff that Charles and Nancy were out in the country visiting some relatives; and here the first conflict in the testimony arises. Plaintiff's wife and daughter both testify that, when the daughter informed defendant that Charles and his wife were in the country, defendant stated to them that they, the members of plaintiff's family, would have to take them out home when they returned to town, as he could not go in again for them. They also testified that defendant's wife visited at the plaintiff's house that day, and was there a good part of the afternoon; that, when defendant got ready to go home, he drove that way to get his wife; that the matter was talked over then; and that defendant again requested them to take Charles and his wife out when they returned from the country. Defendant and his wife both deny the making of any such request, and testify that defendant's wife did not remain at plaintiff's house more than ten minutes. A day or two later plaintiff and his wife took Charles and Nancy and their two trunks out to Charles' home. As they passed defendant's house, they met defendant's wife, who gave them the key which Charles had left with them. Plaintiff then drove up to Charles' house, the women alighted, and, together with Charles, immediately went and unlocked the house, and the ladies entered. Plaintiff then unloaded the larger of the two

trunks, and was rolling it up a board walk leading from the lane to the porch of the house, when defendant appeared upon the scene. Defendant stepped to a wood pile nearby, picked up a length of stove wood about an inch and a half or two inches in diameter, and stepped up to plaintiff, who by that time had rolled the trunk up to the well platform by the porch of the house, and ordered him to leave the premises at once, stating that he did not want him there, that he, plaintiff, knew he did not want him there. Here again there is a conflict in the testimony. Plaintiff testifies that, immediately upon ordering him to leave the premises, defendant struck him a blow with the stick, and at once followed that with a second blow; that he made no offensive demonstration himself, but after the assault at once left the premises. Defendant and his son Charles, who was the only witness of the affray, testify that the defendant repeated his order for plaintiff to leave the premises a number of times; that plaintiff raised up, and asked the defendant "if he knew who he was talking to"; that defendant answered, " 'Yes; Mr. Cowperthwait, I know who I am talking to'; and, as I raised my hand, his went up. We were both in a striking attitude. I think I struck him just as he was making a pass at me. With my right hand I struck him a little glancing blow here, not very hard, not hard enough to break the skin. He rushed on me, still rushed ahead, and struck at me with all his might, and it became necessary for me to brace myself or give my ground. I didn't propose to do that on my doorstep, and I put my foot back that way with my hands up, and we passed blows probably, I think, a minute. My son didn't think it afterwards, but we passed several blows, and I was keeping him off. I watched my chance, and I reached up there. I am a little taller than he is. I reached up that way, and struck him on the right side of the head, right up in there, another light tap. I said, 'Mr. Cowperthwait, won't you go out of my ground'; and he said, 'Yes, I guess I will go.' " They also testified that as plaintiff went away he

used a great deal of profanity, and threatened to send a sheriff and to find a place for defendant to stay. Plaintiff's wife, hearing the disturbance, came out, and, after asking defendant why he had treated her husband so, picked up her husband's hat, joined him in the lane, and together they got into their wagon and drove home. As an attempted justification of his conduct in going upon those premises and forcibly ejecting plaintiff, defendant and his witnesses testified to certain circumstances which defendant claims were suspicious and tended to show that plaintiff was holding improper relations with Charles' wife. This testimony, when first offered by defendant, was objected to by counsel for plaintiff, and the objection promptly sustained by the trial court; but, after counsel for defendant had persisted in their attempt to get the matter before the jury, counsel for plaintiff withdrew their objection, and the court then permitted the introduction of the testimony. This evidence was not at all within the issues, was clearly improper, and should have been excluded. But it was received, went to the jury, and is in the record before us. Defendant insists that he was the owner and in possession of the premises, and that in driving plaintiff from the premises that day he was defending the reputation of his family. He testifies that he had warned plaintiff that he must not come upon his premises, and had told him the reason why. This plaintiff denies. He also testifies that on one occasion he told plaintiff's wife that plaintiff must not come upon his premises, and told her the reason why. In this he is corroborated by his wife, but is flatly contradicted by plaintiff's wife. This notice which he claims to have given to plaintiff and to plaintiff's wife was before Charles and Nancy had gone to Hot Springs; in fact, was some three or four years prior to the time of the assault. It seems that plaintiff's wife did not lose confidence in her husband, nor did Charles lose confidence in his wife, by reason of the attitude of defendant, or by reason of any rumors which may have been in circulation in the neighborhood.

We have carefully examined the evidence in the record before us, which defendant claims shows improper relations between plaintiff and his stepdaughter, and find it to be of the most flimsy character. Not a single incident is testified to which to our minds fastens any guilt upon either the plaintiff or Nancy. No witness testifies to ever having seen them in a compromising situation or under compromising circumstances. The only facts shown are that they had been seen on several occasions either going into or coming out of the barn when Charles was away from home; and that, during the times that Charles was at Sycamore Springs for treatment, plaintiff frequently accompanied Nancy to her home in the evenings, and assisted her in doing the farm chores. On some of these occasions they would go into the house and shut the door. To our minds the evidence establishes nothing more than that friendly relations existed between plaintiff and his stepdaughter, but relations which, so far as the evidence discloses, were entirely compatible with the relationship existing between them as stepfather and-stepdaughter. It is unfortunate that this assault was made on the character of Nancy, and the jury did right in disregarding it. They undoubtedly felt that a woman's reputation for chastity does not hang by so slender a thread. Defendant is evidently a worthy man, and ordinarily a good citizen; but in this instance he was unfortunate in giving way to what appears to us to have been groundless suspicions, and wicked and senseless neighborhood gossip.

The contention of defendant that he was in possession of the premises is not well grounded. We do not deem it necessary to discuss the question of title, or whether or not the surrender of the contract by Charles, without the written concurrence of his wife, could divest him of his homestead right in the premises. Under the undisputed evidence in the case, defendant was not in possession of the house and the walk leading thereto at the time of the assault. The furniture of Charles and Nancy had at all

times remained in the house. The house had been prepared for their reoccupancy by defendant and his wife. The key had been delivered to Charles. Charles and his wife had gone upon the premises and taken possession, and plaintiff being there at their instance and request was lawfully there; and whether defendant was supporting Charles or not is immaterial. Charles and his family were in the actual possession of the premises, and plaintiff was there partly, no doubt, as his guest, and partly in his capacity as a liveryman who had hauled Charles and his wife and their baggage from Pawnee City; and he had a perfect right to unload the baggage and to remain there until Charles ordered him to leave. The trespasser upon those premises on that occasion was the defendant, and not the plaintiff.

The contention that the verdict is excessive, and the result of bias and prejudice, must also fail. Plaintiff received two severe blows upon the head, one of which laid open the scalp for several inches, rolling it up, as testified to by Dr. Johnson, "like a bruise will cause the bark to pull from a tree." Plaintiff was confined to the house for at least 10 days, was unable to do any work for 30 days, and, according to the testimony of the witnesses, had been more or less affected by the injury down to the time of the trial. We do not think the verdict was excessive.

Perceiving no error in the record, we recommend that the judgment of the district court be affirmed.

CALKINS and ROOT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.